Case 1:03-cv-00059  Document 8  Filed in TXSD on 04/17/2003  Page 1 of 18



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 17 2003

Michael N. Milby
Clerk of Court

| | |
|---|---|
| United States of America § | |
|   Plaintiff § | Civil Action No. |
| § | B-03-059 |
| v. § | |
| § | |
| $76,430.57 & $4,274.25 & § | |
|   $5,400,758.09 in United States Currency § | |
|   Defendant § | |

## GUADALUPE ROSALES' VERIFIED SEIZED ASSET CLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, GUADALUPE ROSALES, hereinafter known as the Claimant, and files this his Verified Seized Asset Claim in a portion of the currency seizure made the basis of this civil forfeiture action, and in support thereof, would respectfully show unto the Court as follows:

**I.**

Claimant's Verified Seized Asset Claim is being filed pursuant to 18 U.S.C. § 983(a) and (d) and Rule 6(c) in the Supplemental Rules for Certain Admiralty and Maritime Claims.

**II.**

The seized assets Claimant is claiming an interest in is the seized currency the subject of this forfeiture action, which are $76,430.57, $4,274.25 and $5,400,758.09. Claimant claims a one-half ownership interest in all of this seized currency. The basis for Claimant's interest in this currency is set forth in more detail in Guadalupe Rosales' Affidavit attached hereto as *Exhibit "1"* and incorporated herein for all intents and purposes the same as if set forth at length.

**III.**

In further support of Claimant's seized asset claim, Claimant relies on portions of the sworn testimony from Rebecca Aguirre presented at the hearing on Temporary Restraining Order on February 7, 2003, before the Honorable Leonel Alejandro in the

1 of 4

357th Judicial District Court of Cameron County, Texas. True and correct copies of the portion of said testimony Claimant is relying upon is attached hereto as *Exhibit "2"* and are incorporated herein by reference, the same as if fully set forth at length. The pages of the testimony Claimant is relying upon are pages 55 thru 61 and 73 thru 74. On page 55 thru 61 and again on pages 73 and 74, Ms. Aguirre testified as to the existence of this agreement between Claimant and Jose Luis Betancourt and the terms of it consistent with the affidavit testimony provided by Claimant as set forth in his affidavit attached hereto as *Exhibit "1"*. On page 59 and 60, Ms. Aguirre testified that she was aware of the existence of an agreement regarding any money the Plaintiff and Defendant would win from the Texas Lottery and that it was in effect prior to and on December 11, 2002. Ms. Aguirre testified that the terms of the agreement provided that they would split the winnings 50/50 and that this agreement was in effect on December 11, 2002. On page 60, she also testified that prior to December 11, 2002, they had also split previous winnings in the same manner. On page 73 and 74, Ms. Aguirre also testified the individual who always gave her the money to purchase the lottery tickets was Guadalupe Rosales. She also testified that on this occasion, December 11, 2002, when they had won the Texas Lottery Jackpot of $12,000,000, that Mr. Betancourt stated that he was going to divide it up per the terms of their agreement evenly. *See page 74.*

WHEREFORE, PREMISES CONSIDERED, Claimant, Guadalupe Rosales prays that the Verified Seized Asset Claim be in all things Granted as requested above, and for such other further relief for which Claimant may be justly entitled to, whether at law or in equity.

Respectfully submitted,

Mr. Reynaldo M. Merino
LAW OFFICE OF REYNALDO M. MERINO
4800 North 10th St., Ste. F
McAllen, Texas 78504-2874

BY _____
Reynaldo M. Merino
State Bar No.: 13953250
Attorneys For Claimant, Guadalupe Rosales

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| United States of America | § | |
|   Plaintiff | § | Civil Action No. |
| | § | B-03-059 |
| v. | § | |
| | § | |
| $76,430.57 & $4,274.25 & | § | |
|   $5,400,758.09 in United States Currency | § | |
|   Defendant | § | |

## VERIFICATION

THE STATE OF TEXAS        §

COUNTY OF CAMERON    §

    **BEFORE ME**, the undersigned authority, in and for the aforesaid State and County, on this day personally appeared **GUADALUPE ROSALES**, Claimant in the above styled and numbered cause, who being by me duly sworn, upon his oath, deposed and said that he has personal knowledge of the matters contained in GUADALUPE ROSALES' VERIFIED SEIZED ASSET CLAIM and that the matters contained herein are true and correct.

_____
GUADALUPE ROSALES

    SUBSCRIBED AND SWORN TO BEFORE ME on this the 17th day of April, 2003, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC, STATE OF TEXAS
My commission expires: 1/25/05



3 of 4

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document, GUADALUPE ROSALES' VERIFIED SEIZED ASSET CLAIM was this the _17th_ day of *April, 2003*, forwarded to:

*Via CMRRR*
Mr. Baltazar Salazar
ATTORNEY AT LAW
1612 Winbern
Houston, Texas 77004

Ms. Susan Kempner
Assistant United States Attorney
P.O. Box 61129
910 Travis, Ste. 1500
Houston, Texas 77208

_____
REYNALDO M. MERINO

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| United States of America | § | |
|    Plaintiff | § | Civil Action No. |
| | § | B-03-059 |
| v. | § | |
| | § | |
| $76,430.57 & $4,274.25 & | § | |
| $5,400,758.09 in United States Currency | § | |
|    Defendant | § | |

## AFFIDAVIT IN SUPPORT OF
## GUADALUPE ROSALES' VERIFIED SEIZED ASSET CLAIM

STATE OF TEXAS                §
COUNTY OF CAMERON       §

**BEFORE ME,** the undersigned official, on this day appeared **GUADALUPE ROSALES**, who being duly sworn according to law, upon his oath, deposed and said as follows:

"My name is **GUADALUPE ROSALES**. I am a resident of Brownsville, Cameron County, Texas and I am more than eighteen (18) years of age. I have never been convicted of a crime and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein and they are all true and correct.

I presently live at 527 Rey Juan Carlos, Brownsville, Texas with my wife, Erlinda Rosales. Both my wife and I are unemployed as we are both physically disabled. Prior to living at my present address, I lived at 375 Media Luna Rd., Apt. 3508 in Brownsville, Texas. My wife and I lived at this apartment for approximately two (2) years. At the time we moved into this apartment, Jose Luis Betancourt was living in the apartment above us, which is apartment no. 3507.

Approximately seven (7) to eight (8) months prior to December 11, 2002, Jose Luis Betancourt and I started playing the Texas Lottery under the terms of an agreement. Under the terms of this agreement, I was responsible for selecting the fifteen (15) sets of numbers that we would use to play and I was the individual responsible for giving the money ($15) to Rebecca Aguirre, my APC provider, who was the individual who actually purchased the tickets for me and Mr. Betancourt. The fifteen (15) sets of numbers that we used to play when we began our agreement were the same fifteen (15) sets of numbers that we used on December 11, 2002 when the

winning lottery ticket in question for the Texas Lottery Jackpot of $12,000,000 was won. The reason Rebecca Aguirre purchased these tickets for us was because I was disabled. As my APC provider, Rebecca Aguirre came to our apartment and cleaned our place, did laundry and helped us cook.

Under the terms of our agreement, after I gave $15 to Rebecca Aguirre to purchase $15 worth of lottery tickets, I would then get reimbursed $10 of the $15 by Jose Luis Betancourt. However, even though I only contributed $5 of the $15 to purchase the lottery tickets, our agreement was always to divide whatever winnings we won evenly inasmuch as I was the individual responsible for selecting the tickets and putting the money up front to purchase the tickets. In fact, on several occasions prior to December 11, 2002, when we had won $100 prizes, these prizes were divided evenly 50/50 per the terms of our agreement. Our agreement was also in effect on December 11, 2002 when we purchased the winning lottery tickets for the $12,000,000 Texas Lottery Jackpot.

On December 11, 2002, I gave Rebecca Aguirre $15 to purchase fifteen (15) lottery tickets as we had normally done in the past. Also, the fifteen (15) sets of numbers that Rebecca Aguirre used were the same fifteen (15) sets of numbers we had used in the past. The evening of December 11, 2002, as Mr. Betancourt normally did, Mr. Betancourt came over and reimbursed me my $10 for purchasing the lottery tickets for us. Thus, this agreement to play the Texas Lottery as a group, to share the Texas Lottery winnings equally was in effect on December 11, 2002 and applied to the winning lottery ticket with a $12,000,000 Texas Lottery Jackpot of December 11, 2002. The source of the $15 I used to purchase the lottery ticket on December 11, 2002 was from monthly disability payments that I would receive and from small amounts of money that I would earn from the recycling of aluminum cans that I collected.

The evening of December 11, 2002, I learned that we had won the Texas Lottery Jackpot of $12,000,000 from watching television. The following day, I verified the numbers from a newspaper. After verifying them, I had one of my daughter in laws, Maria Concepcion Ortega call Jose Luis Betancourt to come down, which Jose Luis Betancourt did immediately. Upon arriving to my apartment, Jose Luis Betancourt verified in the newspaper that these were the winning numbers. He checked this several times. We then discussed that Jose Luis Betancourt would travel to Austin to collect the money because I could not travel. For him to do so, I turned over the winning lottery ticket to Jose Luis Betancourt.

The first time Jose Luis Betancourt attempted to collect the Texas Lottery Jackpot, he was unable to do so because he advised he was missing some type of papers or documentation. Although Jose Luis Betancourt told me he would let me know when he was going to attempt to collect the money the second time, he did not do so. I learned that Jose Luis Betancourt had gone back when Rebecca Aguirre advised me that she had seen on television that Jose Luis Betancourt had claimed the money. I later confronted Jose Luis Betancourt as to whether he had in fact obtained the money and he advised he did. During subsequent conversations with Jose Luis Betancourt prior to his arrest, Jose Luis Betancourt told me we were going to divide the winnings equally and that my share was approximately $3.5 million.

Further affiant saith not.

Signed this the 17th day of April, 2003.

_____
GUADALUPE ROSALES

SUBSCRIBED AND SWORN TO BEFORE ME on this the 17th day of April, 2003, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC, STATE OF TEXAS
My commission expires: 01/25/05



```
                                                                      1
```

|    |                          |                              |
|----|--------------------------|------------------------------|
| 1  |       REPORTER'S RECORD                                 |
| 2  |       VOLUME 1 OF 1 VOLUMES                             |
| 3  |    TRIAL COURT CAUSE NO. 2003-01-395-E                  |
| 4  | - - - - - - - - - - - - x                               |
| 5  | GUADALUPE ROSALES         : IN THE DISTRICT COURT        |
| 6  |                           :                              |
| 7  | VS                        : 357th JUDICIAL DISTRICT      |
| 8  | JOSE LUIS BETANCOURT      : CAMERON COUNTY, TEXAS        |
|    | - - - - - - - - - - - - x                               |
| 9  |                                                         |
| 10 |       HEARING ON TEMPORARY RESTRAINING ORDER            |
| 11 |                                                         |
| 12 |     On the 7th day of February, 2003, the following     |
| 13 | proceedings came on to be heard in the above-entitled and|
| 14 | numbered cause before the Honorable Leonel Alejandro,   |
| 15 | Judge Presiding, held in Brownsville, Cameron County,   |
| 16 | Texas.                                                  |
| 17 |     Proceedings reported by computerized stenotype      |
| 18 | machine.                                                |

EXHIBIT "2"

CYNTHIA L. GARZA, CSR, RMR

ORIGINAL

1    she has an attorney.  And I don't know if she's going to
2    want her attorney present.  It's Mr. Greg Powers out of
3    Harlingen, just so that the Court will know that she is
4    being represented.  I don't if Mr. Powers is aware of this
5    hearing.
6                    MR. VELA:  Judge, if I may, I think I can
7    at least add some information to that.  I spoke to
8    Mr. Powers approximately two days ago.  He called me in
9    reference to this case.  It's my understanding that
10   Mr. Merino had advised him that in fact his client was
11   going to be subpoenaed for this type of hearing, and he
12   did not voice, as another officer of the Court, he did not
13   voice any opposition to her testifying in reference to
14   these matters.
15                   As a matter of fact, he advised me that she
16   was going to cooperate with us because she wanted the
17   truth to be known, Judge.  Just to impart that.
18                   THE COURT:  Very well.  Proceed.
19                           **REBECCA AGUIRRE,**
20      having been first duly sworn, testified as follows:
21                         **DIRECT EXAMINATION**
22   **BY MR. CASTANON:**
23        Q.   Ma'am, could you please state your full name?
24        A.   Rebecca Aguirre.
25        Q.   And where do you live, Ms. Aguirre?

56

| | | |
|---|---|---|
| 1 | A. | 1112 East Taylor. |
| 2 | Q. | Here in Brownsville? |
| 3 | A. | Yes, sir. |
| 4 | Q. | What is your job? Where do you work? |
| 5 | A. | I work as an APC provider. |
| 6 | Q. | And what are your duties there as a provider? |
| 7 | A. | I do chores like clean their place, do their laundry, cook for them. |
| 9 | Q. | For other individuals? |
| 10 | A. | Excuse me? |
| 11 | Q. | For older individuals or disabled individuals? |
| 12 | A. | Yes. |
| 13 | Q. | Okay. And do you do that for Guadalupe Rosales and his wife? |
| 15 | A. | Correct. |
| 16 | Q. | And for how long have you been doing that? |
| 17 | A. | Two years, going into three years. |
| 18 | Q. | And do you still do that now? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Were you there -- did you call it APC? |
| 21 | A. | APC provider, correct. |
| 22 | Q. | Were you their APC provider, I guess, at the apartment complex where they're at now? |
| 24 | A. | Was I there first? |
| 25 | Q. | No. Do you go there to their apartment complex? |

CYNTHIA L. GARZA, CSR, RMR

57

```
 1      A.   Correct, yes, uh-huh.
 2      Q.   And just generally, I guess, do you go over to
 3 their house and then help them in their house or their
 4 apartment to do cleaning or whatever needs to be done?
 5      A.   Yes, right.
 6      Q.   All right.  And is Mr. Rosales disabled?
 7      A.   Yes, sir.
 8      Q.   All right.  Now, I'm going to ask you some
 9 questions about a lottery ticket and this agreement that
10 my client alleges they had in effect with Mr. Betancourt,
11 all right?
12      A.   Uh-huh.
13      Q.   Okay.  Now, do you have knowledge about that?
14      A.   Yes, sir.
15      Q.   All right.  And are you here to tell the judge
16 the truth in this matter?
17      A.   Yes, sir.
18      Q.   And has anyone, and I'll speak for our side,
19 have we or any attorney representing Mr. Rosales ever
20 offered you any money or anything, any benefit, for you to
21 come up here and testify?
22      A.   No, sir.
23      Q.   Have we ever asked you to fabricate or make up
24 any of your testimony?
25      A.   No, sir.
```

58

```
 1        Q.   Okay.  And I'm going to ask you the questions,
 2   but have you already spoke to the U.S. Customs?
 3        A.   Yes, sir.
 4        Q.   Okay.  And did you tell them the truth to the
 5   best of your knowledge?
 6        A.   Yes, sir.
 7        Q.   And is that what you're going to try and do here
 8   for us?
 9        A.   Correct.
10        Q.   And you will do that?
11        A.   Yes, sir.
12        Q.   All right.  Now, we're discussing or
13   disputing -- there is a dispute over this lottery ticket
14   of December the 11th, 2002.  Are you familiar with that?
15        A.   Yes.
16        Q.   Okay.  Were you the individual who went and
17   bought that lottery ticket?
18        A.   Correct.
19        Q.   And when you bought that lottery ticket, did you
20   buy several other lottery tickets?
21        A.   Yes.
22        Q.   All right.  Now --
23             MR. CASTANON:  Did you introduce the
24   lottery ticket?
25             MR. SALAZAR:  No.
```

CYNTHIA L. GARZA, CSR, RMR

```
 1                 MR. CASTANON:  Okay.  Excuse me one second.
 2                 Your Honor, may I see the exhibits he
 3   introduced?
 4                 THE COURT:  It's only been one, I think.
 5                 MR. CASTANON:  Okay.
 6        Q.   (BY MR. CASTANON)  Now, let me ask you this:
 7   What was your understanding of the agreement
 8   Mr. Betancourt and Mr. Rosales had in effect on December
 9   the 11th, 2002, regarding any money they may win from the
10   Texas Lottery?
11                 MR. SALAZAR:  Your Honor, I'm going to
12   object.  Unless she has personal knowledge of the actual
13   agreement, I don't think she can testify unless she has
14   personal knowledge.
15                 THE COURT:  Sustained.
16        Q.   (BY MR. CASTANON)  Did you know what agreement
17   they had in place?
18        A.   Yes, sir.
19        Q.   And had they told you what the agreement was?
20        A.   Uh-huh.  They were to go 50/50.
21        Q.   Okay.  And was that the agreement they have on
22   December 11th, 2002, when they bought the lottery ticket
23   in question, the one that won?
24        A.   Yes, sir.
25        Q.   Okay.  Now, did they have this agreement in
```

```
 1   place before that date?
 2        A.   Yes.
 3        Q.   Okay.  And before that date, had they split
 4   other winnings in the same manner?
 5        A.   Yes.
 6        Q.   Okay.  And the tickets -- well, let me ask you
 7   this:  The numbers that they used, who provided you with
 8   these numbers?
 9        A.   Mr. Rosales.
10        Q.   Okay.  Did Mr. Betancourt ever provide you with
11   the numbers?
12        A.   Never.
13        Q.   Okay.  Now, on those occasions prior to
14   December 11, 2002, who gave you the money to go buy the
15   tickets?
16        A.   Mr. Rosales.
17        Q.   Okay.  Did Mr. Betancourt ever give you the
18   money to go buy any of the tickets?
19        A.   Never.
20        Q.   Okay.  On December the 11th or the Wednesday
21   that you bought these lottery tickets, the numbers that
22   you went to -- the numbers you were told to use, were
23   those given to you by Mr. Rosales?
24        A.   Yes, sir.
25        Q.   And was Mr. Rosales the individual who gave you
```

61

1   the money, the $15, to buy the tickets?
2       A.   Yes, sir.
3       Q.   And these same numbers were numbers that you all
4   used on prior occasions?
5       A.   Correct.
6            MR. CASTANON:  Your Honor, may I approach
7   the witness?
8            THE COURT:  You may.
9       Q.   (BY MR. CASTANON) I'm going to show you some
10  lottery tickets for the week before, which is
11  December 7th, okay?  I'm going to show you three lottery
12  tickets.
13           Do you recognize that as being lottery
14  tickets that you had bought for Mr. Rosales?
15      A.   Yes.
16      Q.   Okay.
17           MR. SALAZAR:  I'm sorry, the answer was
18  yes?
19      A.   Yes.
20      Q.   (BY MR. CASTANON) And I'm going to show you a
21  copy of them.  Let me see.  02, 04, 07.  Okay.  I'm
22  showing you a copy.  Is that copy to your right a true and
23  correct copy of what's there, the original tickets?
24      A.   Yes.
25      Q.   All right.  Now, there's different sets of

CYNTHIA L. GARZA, CSR, RMR

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | **REDIRECT EXAMINATION**                                             |
| 2   | BY MR. CASTANON:                                                     |
| 3   | Q. Okay. You purchased the tickets, didn't you?                      |
| 4   | A. Yes, sir.                                                         |
| 5   | Q. And you're not claiming an interest in this, are                  |
| 6   | you?                                                                 |
| 7   | A. No, sir.                                                          |
| 8   | Q. And you purchased the money with money you gave                   |
| 9   | to the attendant, to the cashier, to the clerk; right?               |
| 10  | A. Correct.                                                          |
| 11  | Q. Okay. And this was money that had been given to                   |
| 12  | you by my client --                                                  |
| 13  | A. Right.                                                            |
| 14  | Q. -- Mr. Rosales, correct?                                          |
| 15  | A. Uh-huh.                                                           |
| 16  | Q. And on these other occasions, whatever --                         |
| 17  | however the money got there, what you are telling this               |
| 18  | judge, though, is the individual who gave you the money              |
| 19  | was always my client?                                                |
| 20  | A. Correct.                                                          |
| 21  | Q. Okay. And regardless of how that money came                       |
| 22  | there, at least on prior occasions when they won they                |
| 23  | always divided it up?                                                |
| 24  | A. Yes, sir.                                                         |
| 25  | Q. And that was the agreement they had, wasn't it?                   |

74

A. Correct.

Q. And when they won this one, did Mr. Betancourt, on these other occasions, did he say they were going to divide it up?

A. Yes, sir.

Q. And did he say on this occasion they were going to divide it up?

A. Yes, sir.

Q. He did?

A. Uh-huh.

Q. Okay. And did you ever hear Mr. Betancourt say, "Hey, these were the numbers I chose, or this is my ten bucks. It's all mine?"

A. Never.

Q. Never said that? Until now, today's the first time you've heard that?

A. Right.

Q. Do you believe Mr. Betancourt is trying to take advantage of Mr. Rosales?

MR. SALAZAR: Your Honor, I'm going to object. Calls for speculation.

THE COURT: Sustained.

MR. SALAZAR: Clearly.

THE COURT: Why don't you move on, counsel.

MR. CASTANON: Your Honor, I have no

```
 1   THE STATE OF TEXAS:
 2   COUNTY OF CAMERON:
 3              CERTIFICATE OF COURT REPORTER
 4        I, CYNTHIA L. GARZA, Official Court Reporter in and
 5   for the 357th Judicial District Court of Cameron County,
 6   State of Texas, do hereby certify that the above and
 7   foregoing contains a true and correct transcription of all
 8   portions of evidence and other proceedings requested in
 9   writing by counsel for the parties to be included in this
10   volume of the Reporter's Record, in the above-entitled and
11   numbered cause, all of which occurred in open court or in
12   chambers and were reported by me.
13        I further certify that this Reporter's Record of the
14   proceedings truly and correctly reflects the exhibits, if
15   any, admitted by the respective parties.
16        I further certify that the total cost for the
17   preparation of this Reporter's Record is $    and was
18   paid/will be paid by Mr. Castanon.
19        WITNESS MY OFFICIAL HAND on this the 21st day of
20   February, 2003.
21   
            CYNTHIA L. GARZA, Texas CSR, RMR
22          Official Court Reporter
            357th District Court
23          974 East Harrison Street
            Brownsville, Texas 78520
24          (956) 548-9522
            Certificate No. 2510
25          Expiration Date: 12/31/03
```